IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RANDY WILLIAMS,

*Plaintiff,*

v.

BALTIMORE COUNTY,
MARYLAND, ET AL.,

*Defendants.*

Civil Action No.: ELH-13-03445

## MEMORANDUM OPINION

In this employment discrimination case, plaintiff Randy Williams, a Sergeant with the Baltimore County Police Department (the "BCPD" or the "Department"), filed suit against Baltimore County, Maryland (the "County"), defendant,[1] asserting four claims: employment discrimination on the basis of race, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e, *et seq.* (Count I); a racially hostile work environment, in violation of Title VII (Count II); employment discrimination on the basis of race, under 42 U.S.C. § 1981 (Count III); and retaliation, in violation of Title VII (Count IV).[2]

Following discovery, the County filed a Motion for Summary Judgment (ECF 38), a supporting memorandum (ECF 38–1) (collectively, "Motion"), and exhibits. Plaintiff filed a response in opposition ("Opposition," ECF 43) with exhibits, and the County has replied. "Reply," ECF 46.

---

[1] Plaintiff also sued BCPD, but subsequently dismissed his claims against the Department. ECF 8.

[2] This case was reassigned from Judge William D. Quarles, Jr. to me on January 29, 2016, due to the retirement of Judge Quarles. *See* Docket.

The Motion has been fully briefed, and no hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I will grant the Motion.

## I.      Factual and Procedural Background[3]

Plaintiff, who is African-American, began work with the BCPD in December 1996 and was promoted to the rank of Sergeant on January 30, 2004. ECF 43-1, Affidavit of Randy Williams, ¶¶ 3, 4. During 2004, Sgt. Williams was assigned to the Baltimore County Police Academy (the "Academy"), where he taught classes "relating to ethics, investigation of hate crimes, bias, and diversity." *Id.* After a posting to the BCPD Youth and Community Resources Division (*id.* ¶ 4), plaintiff was transferred to BCPD's Woodlawn Precinct in June 2010 and assigned to Shift I, the "'midnight shift.'" *Id.* ¶ 5.

Shortly after Sgt. Williams's transfer to the Woodlawn Precinct in June 2010, Lieutenant Janet Ensor, who is "white" (*id.*), became Sgt. Williams's commander. *Id.* Lt. Ensor supervised three sergeants, each of whom commanded a squad. *See id.* ¶¶ 6-7. Sgt. Williams supervised a squad that consisted of nine officers. *Id.* ¶ 5. Plaintiff asserts, ECF 1 ¶ 21: "Both of the other squads under Lt. Ensor's command were led by Sergeants who are white."

Sgt. Williams maintains that he was "instructed to monitor and report on other black police officers." ECF 1 at 2. In particular, Sgt. Williams alleges that, shortly after Lt. Ensor assumed command, she met with plaintiff to discuss "'performance issues'" as to three African-

---

[3] The chronology of events is not clear, despite the parties' lengthy submissions. Accordingly, on occasion, and as indicated, I have drawn inferences as to the timing of certain events.

The County vigorously disputes plaintiff's version of events. But, I have generally omitted reference to the County's testimonial account because, as discussed, *infra*, I cannot decide issues of credibility in the posture of this case and I must construe the facts in the light most favorable to plaintiff.

American officers in his squad, claiming that they "were deficient in the basic roles of policing: writing tickets, writing warrants, making arrests, writing reports, and the like." ECF 43-1 ¶ 6. Sgt. Williams also maintains that Lt. Ensor identified five other African-American officers with "'performance issues'" in the two other squads that she supervised. *Id.* ¶ 7. In particular, Sgt. Williams alleges that Lt. Ensor maintained that these officers "were lazy and therefore were not performing their jobs satisfactorily." *Id.* Sgt. Williams contends, *id.* ¶ 8: "Lt. Ensor instructed me to observe the eight black officers she had mentioned—including the five who were not even in my squad—and report back to her regarding performance deficiencies."

According to plaintiff, Lt. Ensor did not identify any "white officers" who "had any performance issues" and "did not instruct [him] to observe any white officers or report back to her regarding the performance of white officers." *Id.*; *see* ECF 43-2, Williams Deposition Transcript, at 6. Sgt. Williams maintains, ECF 43-1 ¶ 9: "I perceived that she had singled me out because I am black and, for that reason, wanted to use me to 'watch' other black officers and report to her regarding performance deficiencies. I also perceived that she had targeted these black officers for discipline because they are black."

Plaintiff alleges that Lt. Ensor did not permit him to select subordinates to serve as "Acting Sergeants." ECF 43-1 ¶ 26. Yet, he maintains that it is BCPD practice, if not written policy, to permit sergeants to select Acting Sergeants and that he had been permitted to do so for more than a decade.[4] ECF 43-2 at 23. By email of October 6, 2010, Lt. Ensor assigned officers

---

[4] At his deposition, Williams stated, ECF 43-2 at 23: "As a sergeant on the Baltimore County Police Department for over ten years, this is the first time I encountered where a sergeant could not pick his actors in his absence." In Sgt. Williams's Affidavit, however, he indicated that he was promoted to the rank of Sergeant on January 30, 2004 (ECF 43-1 ¶ 4), less than seven years before Lt. Ensor began to appoint Acting Sergeants. *Id.* ¶ 26

to serve as Acting Sergeants for each squad.   ECF 43-1 ¶ 26.   Williams submits that, for the other squads under Ensor's command, Ensor merely reappointed existing Acting Sergeants.   *Id.*; ECF 43-2 at 23.   But, Ensor removed plaintiff's chosen Acting Sergeant, Ofc. Sean Langeheine (*id.* at 23; *see id.* at 3), who is "Korean."   *Id.* at 3.   In Ofc. Langeheine's stead, Ensor appointed Ofc. John Dill, who is "white."   ECF 43-1 ¶ 15.   On two occasions, Williams "had already attempted to discipline [Dill] for insubordination . . . ."   *Id.* ¶ 26; *see* ECF 43-2 at 23.

Plaintiff maintains that he was "disciplined for conducting research regarding diversity and hate crimes" for use by the Academy.   ECF 1 at 5.   According to Sgt. Williams, in October 2010, he received a request from Ofc. Jennifer Peach to assist in teaching a class on diversity at the Academy.   ECF 43-1 ¶ 10; *see* ECF 43-2 at 13-14.   Ofc. Peach had been assigned to teach the course that Williams had previously taught and she "requested [his] assistance in helping her transition into the teaching role."   ECF 43-1 ¶ 10.   Sgt. Williams "conducted some internet research in the precinct sergeant's office to provide additional information to Officer Peach in her preparations for the class."   *Id.*   On October 14, 2010, Lt. Ensor saw Williams "doing this research" and "demanded to know" what he was doing.   *Id.*   Williams claims that Lt. Ensor "continued to question [him] aggressively about the research" (*id.*), which was "very demeaning," "belittling," and "accusatory."   ECF 43-2 at 14.

On October 14, 2010, Williams also took part in the arrest of an assault suspect.   ECF 43-1 ¶ 15.   During the course of his investigation, Sgt. Williams identified Brian Shue as a suspect in "multiple first degree assaults."   *Id.*   According to plaintiff, he and Lt. Ensor arrested Shue and transported him to the Woodlawn Precinct.   *Id.*   Sgt. Williams contends that he instructed Ofc. Dill to treat Shue as a suspect and to interrogate him about other criminal activities.   *Id.*; *see* ECF

43-2 at 9-10.  But, Ofc. Dill did not follow orders and instead "incorrectly listed Mr. Shue as a witness in the crime and released him without charges."  ECF 43-1 ¶ 15.  Williams reported Ofc. Dill's conduct to his superiors, including Lt. Ensor, but no action was taken.  *Id*.  Sgt. Williams contends that Lt. Ensor "sided with Officer Dill" and instead "alleged that [Williams's] arrest of Mr. Shue was unlawful."  *Id.* ¶ 16.  According to plaintiff, Lt. Ensor sought to charge plaintiff with false arrest.  *Id.*  Although plaintiff contends that he was not charged, plaintiff alleges that he received a "written counseling form"[5] from Ensor.  *Id.*  And, on or about November 15, 2010, Lt. Ensor issued a performance evaluation that criticized Williams for his handling of Shue's arrest.  ECF 43-1 ¶ 18.  According to plaintiff, he appealed the performance evaluation.  *Id.*

Lt. Ensor called the Academy on October 15, 2010, "to investigate" Williams's explanation for why he "was conducting internet research regarding diversity and hate crimes." ECF 43-1 ¶ 11.  Plaintiff maintains, ECF 43 at 10-11: "Lt. Ensor's calling the Academy to 'investigate' the nature of Sgt. Williams' teaching responsibilities and research would obviously have a chilling effect on his efforts—and the efforts of others—to educate officers regarding diversity and hate crimes."

Williams also submits that Lt. Ensor objected to his efforts "to further train [his] subordinate officers by speaking to them as a group regarding diversity and race-related issues." ECF 43-1 ¶ 12.  Plaintiff contends, *id.*: "Lt. Ensor instructed me not to talk to my subordinate officers about issues of diversity and race relations."  *See* ECF 43-2 at 15.  According to Sgt. Williams, he complained to Lt. Ensor's superiors.  ECF 43-1 ¶ 13.  On October 22, 2010, Lt.

---

[5] Plaintiff explains, ECF 43 at 16 n.7: "Written 'counseling' is a form of informal discipline."  Lt. Ensor testified, however, that a counseling form can "document negative or positive things an officer does."  ECF 43-4 at 38.

Ensor responded by issuing Williams "a written counseling form for failing to 'follow the chain of command' in regard to [his] complaints about her." *Id.* ¶ 14.

On November 19, 2010, during the pendency of Williams's appeal of his performance evaluation concerning the arrest of Shue, Williams found Lt. Ensor "on the floor on her knees reviewing a number of papers she had retrieved from the recycling bin" under the computer terminal that he had been using in the precinct office. *Id.* ¶ 19; ECF 43-2 at 18-19. Williams asserts, ECF 43-1 ¶ 19: "When I saw her rummaging through the recycling bin, she grabbed a manila folder, asked me if she could have it, and quickly left the office holding an empty manila folder."

Sgt. Williams submits that on November 21, 2010, Lt. Ensor falsely accused him of failing to notify a correctional officer's supervisor that the correctional officer was a suspect in a crime. ECF 43-1 ¶ 20; ECF 43-2 at 19. Plaintiff maintains that he had notified the correctional officer's supervisor and that Lt. Ensor was on duty on the night of the incident. ECF 43-1 ¶ 20.

On December 15, 2010, plaintiff responded to a "quadruple stabbing incident." *Id.* ¶ 21. Sgt. Williams maintains that he was the first officer on the scene and that he "detained one suspect, called for backup, called for an ambulance to treat multiple stabbing victims, and otherwise acted to quickly control and secure the scene." *Id.*; *see* ECF 43-2 at 20. Plaintiff asserts: "[U]ltimately [the] suspects were improperly released and a bloody knife was improperly handled by officers at the scene." ECF 43 at 13. From plaintiff's Affidavit (ECF 43-1), it appears that plaintiff attributes these errors to Lt. Ensor. *Id.* ¶ 21. According to Sgt. Williams, Lt. Ensor later complained to her superiors that plaintiff "had failed to handle and control the critical incident at the scene." *Id.*

On January 20, 2011, Lt. Ensor asked Williams to leave the precinct permanently.  ECF 43-2 at 24.  Plaintiff asserts, ECF 1 ¶ 97: "Lt. Ensor has never asked a white officer to leave the precinct."  At his deposition, Sgt. Williams testified, *id.*:

> The first time she implied that I should go work for Internal Affairs, as if I was some kind of rat.  The second time she told me to go to Wilkens[6] and then she told me the short version of her story about how in the past some lieutenant told the sergeant to leave the precinct as if I was supposed to catch a clue, so it was actually twice.

Plaintiff filed an "Intake Questionnaire" with the U.S. Equal Employment Opportunity Commission (the "EEOC") on February 10, 2011.  ECF 43-12.  The EEOC initiated an investigation and issued a "Notice of Charge of Discrimination" to the BCPD, dated February 25, 2011.  ECF 43-13 at 1.  Sgt. Williams also claims (ECF 43-1 ¶ 44) that on April 4, 2011, he provided the EEOC with an additional submission, titled "Hostile Work Environment" (ECF 43-14), in which he levied specific allegations against Lt. Ensor.  *Id.* at 1 (stamped "Received Balt. Field Office U.S. EEOC 2011 Apr 4").

On March 25, 2011, plaintiff learned from one of his subordinates, Officer Catherine Greenbeck, that Lt. Ensor had said that Williams was a poor supervisor and that other officers were "calling out sick" because of his poor leadership.  ECF 43-1 ¶ 22; ECF 43-2 at 21.  And, on April 19, 2011, he learned from Officer Greenbeck that Lt. Ensor had called Williams a "liar." ECF 43-1 ¶ 23; ECF 43-2 at 21.

Plaintiff also identifies instances in which he alleges that he reported to his superiors instances of misconduct by "white" officers, but his superiors took no action.  ECF 43 at 19. Plaintiff contends that, during some unspecified period, although apparently before April 17,

---

[6] The Wilkens Precinct is another BCPD precinct at which plaintiff previously served. ECF 43-1 ¶ 4.

2011 (*see* ECF 43-2 at 12), he reported to Lt. Ensor in writing "probably ten times" (ECF 43-2 at 12) that Ofc. Joshua Summers (ECF 43-11 at 2) was falsely calling in sick. ECF 43-2 at 12. According to plaintiff, Lt. Ensor took no action. *Id.* In addition, Sgt. Williams contends that he reported an unnamed officer for lying about court duty to avoid work, but that Lt. Ensor again did not discipline the officer. *Id.*

On April 17, 2011, Lt. Ensor removed plaintiff from his position as one of her Acting Lieutenants. ECF 43-1 ¶ 27.[7] According to plaintiff, Ensor "appointed a white sergeant as acting lieutenant who was junior to [Williams] and was still on probation at the time." *Id.*; *see* ECF 43-2 at 24. Plaintiff avers, ECF 43-1 ¶ 27: "Lt. Ensor's actions were humiliating to me and undermined my authority on the shift." However, on some unspecified date, but no later than July 5, 2011, Sgt. Williams returned to the role of Acting Lieutenant. ECF 43-1 ¶ 29 ("On July 5, 2011, while serving as acting lieutenant . . .").[8]

Plaintiff learned from his subordinates on May 21, 2011, that Lt. Ensor had instructed them "to document attempted armed robberies as first degree assaults." ECF 43-1 ¶ 24; *see* ECF 43-2 at 21. Plaintiff contends that documenting crimes in this fashion would have violated BCPD policy (*see* ECF 43-2 at 21) and that he instructed his subordinates to document crimes appropriately. ECF 43-1 ¶ 24.

On June 9, 2011, plaintiff's squad "responded to a hospital to investigate an alleged rape involving a 4-year-old victim." ECF 43-1 ¶ 25. Because the victim spoke only Spanish, an interpreter was summoned. ECF 43-2 at 21. While the squad was waiting for the interpreter, Lt.

---

[7] Acting Lieutenants appear to perform the role of lieutenant during a lieutenant's absence. *See* ECF 43-4 at 68-69.

[8] It is not clear whether Ensor was plaintiff's supervisor at the point that plaintiff returned to the position of Acting Lieutenant.

Ensor called Williams twice on his personal cell phone.   ECF 43-1 ¶ 25.   Sgt. Williams

maintains that he had previously asked Ensor to "communicate with [him] only on police radio"

(*id.*) and that Lt. Ensor was under orders to do so.   ECF 43-2 at 22.   Sgt. Williams submits, *id.*: "I

stated I wanted to talk to her in front of witnesses and/or communications that would be copied

because she had lied on me several times in the past."   Sgt. Williams apparently did not answer

Lt. Ensor's calls, but she ultimately reached him "on the hospital phone."   ECF 43-1 ¶ 25.   When

plaintiff spoke with Ensor, she "began shouting at [him] to give her an update on the situation."

*Id.* Williams told Ensor that he could not provide a status update because the interpreter had not

yet arrived.   *Id.*   According to plaintiff, Ensor later reported to her superiors that Williams had

not responded to her radio call and that he had falsely stated that his squad was awaiting an

interpreter.   *Id.*

  Williams had several clashes with his superiors, and on some unspecified date, his

precinct captain offered to permit Williams to transfer to a different shift.   ECF 43-2 at 11.

However, the precinct captain's attempt to transfer Williams was overruled.   *Id.*   Plaintiff

submits that it was "highly unprecedented" for a precinct captain to receive orders from a

superior regarding the work assignment of a subordinate officer.   *Id*; *see* ECF 43-3, Deposition

of Capt. Andre Davis, at 2.

  On June 13, 2011, Sgt. Williams signed a "Charge of Discrimination" that the EEOC had

prepared ("First Charge" or "First Charge of Discrimination").   ECF 43-16 at 1; *see* ECF 43-15,

Letter from EEOC to Sgt. Williams, dated June 6, 2011.   It was cross filed with the Maryland

Commission on Human Relations.[9]  ECF 43-16 at 1.  The First Charge alleged discrimination

based on "race" and named BCPD as the respondent.  *Id.*  It also indicated that the earliest date

of discrimination was July 18, 2010, and the latest date of discrimination was October 15, 2010.

*Id.*  Plaintiff did not check the "continuing action" box.  *Id.*  The "particulars" of the charge were

stated as follows, *id.* at 1-2:

> I.      I began my employment at the above named employer in December 1996.
> My most recent position is a Police Sergeant. On October 14, 2010 I
> received an email regarding Lt Janet Ensor calling the police academy
> regarding me teaching diversity and investigations of hate crimes after she
> was instructed not to do so. On October 22, 2010 I received a written
> warning from Lt Ensor for failing to communicate to an Officer and for
> failing to follow chain of command. On November 5, 2010 I received a
> written warning from Lt Ensor for an alleged illegal arrest. Lt Ensor does
> not allow me to discipline the white Police Officers in my unit, and will
> discuss with me disciplinary action against black Police Officers who are
> not in my unit. Lt Ensor will remove white Police Officers from my unit
> who I have disciplined. Two similarly situated employees, Sergeant Brian
> Cwalina (white) and Sergeant Steve Suprik (white) have not been
> subjected to this treatment.
>
> II.     I have reported these incidents to Capt Howard and Anthony Russell, EEO
> Fair Practice Officer but nothing has been done[.]
>
> III.    I believe I have been discriminated and retaliated against because of my
> race (black) in violation of Title VII of the Civil Rights Act of 1964, as
> amended with respect to discipline, participating in protected activity,
> harassment and terms and conditions of employment.

Plaintiff appears to have appended to his First Charge a signed submission titled

"Continued Harassment" (the "First Charge Supplement"), which is also dated June 13, 2011.

ECF 43-16 at 3.  It elaborates as to allegations contained in the First Charge.  *Id.*; *see* ECF 43-16

at 1-2.  In particular, the First Charge Supplement states that Lt. Ensor instructed Sgt. Williams's

---

[9]  The Maryland Commission On Human Relations is now known as the Maryland
Commission on Civil Rights.  ECF 38-1 at 5 n.1.

subordinates to "title obvious armed robbery reports [as] first degree assaults." ECF 43-16 at 3. In addition, Sgt. Williams maintains that he sent an email to other officers to try to clarify BCPD's crime reporting criteria. *Id.* The First Charge Supplement identifies "Sergeant Gregory Mead" as one of the recipients of Sgt. Williams's emails. *Id.* Although the First Charge Supplement refers to "attached e-mails" (*id.*), no emails were submitted to the Court. Notably, the First Charge Supplement contains allegations only as to misconduct by Lt. Ensor.

On July 5, 2011, plaintiff was reviewing reports from each squad assigned to his shift. ECF 43-1 ¶ 29. He learned from the reports that Officer Christopher Neal, who is "white," was involved in the arrest of a "black female." *Id.*; *see* ECF 43-2 at 7. Williams maintains that Ofc. Neal's report of the arrest "made no mention of the use of force or . . . injuries." ECF 43-1 ¶ 29. From other reports, however, Williams learned that "Officer Neal had struck the suspect in the head with his handgun four or five times, causing a severe head injury that required nineteen staples." *Id.* Williams maintains that he reported Ofc. Neal's omission in his report to a superior, who relayed the information to the Internal Affairs Division (*id.*) and told Williams to cease investigating the matter. ECF 43-2 at 8. Plaintiff asserts, ECF 43-1 ¶ 29: "I was never contacted by Internal Affairs for an interview or to give a statement regarding my findings."

By around mid 2011, Lt. Ensor no longer supervised Sgt. Williams. ECF 43-2 at 18 (indicating that Sgt. Williams worked under Lt. Ensor for "[p]robably a little bit longer" than a year, and he began to work for her in or about June 2010). On some unspecified date,[10] although no later than November 2012, Lt. Gregory Mead, who is "white" (ECF 43-1 ¶ 34), became Sgt.

---

[10] Sgt. Williams stated that he was an Acting Lieutenant in July 2011 (ECF 43-1 ¶ 29) and testified that Lt. Mead appointed him as an Acting Lieutenant. ECF 43-2 at 26. Thus, Lt. Mead may have assumed command as early as July 2011.

Williams's commander.[11]   ECF 43-2 at 25.   Sgt. Williams served as an Acting Lieutenant under Lt. Mead.   *Id.* at 26.

Plaintiff contends that, at some unspecified point, Lt. Mead and "other white lieutenants" complained to their precinct commander, Captain Andre Davis, about Sgt. Williams's attempts to lead "diversity-related" training sessions for BCPD officers.   ECF 43 at 11.   Plaintiff asserts, *id.* at 43: "Sgt. Williams was called a 'cancer' by white superiors for attempting to train and instruct his subordinate officers regarding diversity and race-related issues."   According to Captain Davis's deposition testimony, Lt. Craig Mitchell, to whom Sgt. Williams did not report, described Sgt. Williams as a "cancer" during a "monthly lieutenant's meeting" at which Lt. Mead was present.   ECF 43-3 at 11.   As the County notes in its Reply (ECF 46 at 5), there is no indication from Captain Davis's deposition testimony that Sgt. Williams was present at the meeting or that he was aware, before filing suit, that a superior officer had described him as a "cancer."   ECF 43-3 at 10-11.

After Lt. Mead assumed command, plaintiff was "commended" for reporting "unlawful conduct by a black officer," but "threatened and verbally abused" when "he reported unlawful conduct by two white officers . . . ."   ECF 1 at 11.   Sgt. Williams alleges that in 2012 he "conducted an investigation of misconduct by a subordinate officer, who was black, which

---

[11] It is unclear whether Lt. Mead served as Sgt. Williams's direct supervisor until Sgt. Williams's departure from the Woodlawn Precinct in May 2013, which is discussed *infra*.   Sgt. Williams's Affidavit identifies Lt Mead as "the commander of the unit in which Officer Baker and Officers Higgins were assigned."   ECF 43-1 ¶ 34.   This suggests that Sgt. Williams may not have been under Lt. Mead's direct supervision when Sgt. Williams departed the Woodlawn Precinct.

resulted in the officer's termination in November 2012."[12]  ECF 43-1 ¶ 28.  Sgt. Williams was "commended by his superiors for the excellent work that he did in recognizing and reporting the unlawful and improper conduct by the officer . . . ."  ECF 1 ¶ 104; *see* ECF 43-3 at 6 ("[Williams] did a great job in putting a lot of the substance in this packet," which served as the basis for the officer's termination.).

In contrast, plaintiff maintains that he was "berated, threatened, and accused of having improper motives" when he reported misconduct by "two white officers" (ECF 1 ¶ 105), *i.e.*, Ofc. Ryan Baker and Ofc. Jason Higgins.  ECF 43 at 19.  Ofc. Baker and Ofc. Higgins were not assigned to Sgt. William's squad (*see* ECF 43-2 at 25), although Sgt. Williams maintains that he supervised both officers in his capacity as Acting Lieutenant.  *Id.* at 26.  According to Sgt. Williams, on January 29, 2013, Ofc. Baker and Ofc. Higgins participated in an operation to retrieve stolen weapons in Baltimore City, outside of BCPD's jurisdiction.  *Id.* at 25-26.  Sgt. Williams claims that, absent exigent circumstances or authorization, BCPD officers may not conduct operations outside of their jurisdiction.  *Id.* at 26; *see* ECF 43-3 at 9-10 (Baker "should have never been involved, let alone in a pursuit down there [in Baltimore City], but [sic] been involved in the investigation unless it was some type of joint investigation that we were working.").

On May 4, 2013, Ofc. Baker and Ofc. Higgins had a "physical confrontation" with a "black man," who was ultimately arrested for "assaulting a police officer."  ECF 43-1 ¶ 32. According to plaintiff, the unnamed suspect suffered from "mental health issues" (*id.* ¶ 33) and "had to be taken to a hospital to be treated for his injuries."  *Id.* ¶ 32.  Sgt. Williams states, *id.* ¶

---

[12]  Sgt. Williams also contends that he issued written "counseling" to three African-American officers in his squad.  ECF 43-2 at 5.

33: "I do not believe there was a lawful basis for Officer Baker and Officer Higgins to stop the man, much less to use any force against him or arrest him."

Plaintiff contends that he sent written complaints to Lt. Mead about the conduct of Ofc. Baker and Ofc. Higgins in these two incidents. *Id.* ¶ 34. Sgt. Williams met with Lt. Mead and two unnamed sergeants on May 8, 2013. *Id.* However, plaintiff claims that Lt. Mead had not read Williams's written complaints. *Id.* According to Sgt. Williams, Lt. Mead "became angry and stated, 'I am tired of this shit.'" *Id.* Plaintiff maintains that Lt. Mead also said, *id.*: "'I do not know what you are trying to do, but I will crush you.'"

Sgt. Williams submits that Lt. Mead also accused him "of being part of a conspiracy with Lieutenant Orlando Lilly, who is also black." *Id.* ¶ 35. Lt. Lilly is the President of the Blue Guardians, "a minority organization in the Police Department that represents issues for minority police officers." ECF 43-8, Orlando Lilly Deposition, at 2. Plaintiff states, ECF 43-1 ¶ 35: "I later learned that Lt. Lilly had reported use of brutal and excessive force by a white officer in Lt. Lilly's precinct." During plaintiff's meeting with Lt. Mead, Lt. Mead also said, ECF 43-1 ¶ 36: "'I am not going to deal with this mother fucking shit.'" Sgt. Williams adds that Lt. Mead "stated that he did not intend to do anything about any of the issues I had raised" and "told [Williams] to leave the precinct." ECF 43-1 ¶ 38.

Plaintiff does not allege that Lt. Mead made any reference to plaintiff's First Charge of Discrimination during the meeting. The following exchange ensued at Lt. Mead's deposition on March 20, 2015 (ECF 43-10 at 2):

> Q What's your understanding of any statements or allegations of race bias that have been made by Sergeant Williams?

A Just that the department is race based from what I read in the internal and that our -- that I allow racial issues to go on on the shift -- on our shift at the precinct.

Q And those allegations were specific to you?

A Yes, sir.

Q In terms of your management?

A Yes, sir.

Q Supervision of your officers?

A Yes, sir.

Q Other than the allegations that were made in reference to you, are you aware of any other incidents or allegations involving Sergeant Williams relating to race bias within the department?

A Not specifics, no.

On May 10, 2013, plaintiff received notice that he "had been administratively transferred to Cockeysville Precinct."  ECF 43-1 ¶ 39.  Plaintiff alleges that he was "not given a reason for the transfer."  *Id.*  Sgt. Williams asserts, *id.* ¶ 40: "In my experience, a sergeant in the [BCPD] would be involuntarily transferred from one precinct to another only for disciplinary reasons." Plaintiff submits that he was "later told by another officer that the reason [he] was transferred is that [he] 'disrespected' Lt. Mead."  *Id.*  Sgt. Williams maintains that Lt. Mead charged him "with rude and discourteous actions"—allegations that precipitated his transfer.  *Id.*  According to plaintiff, Internal Affairs later deemed Lt. Mead's allegations to be unfounded.  *Id.*[13]

Plaintiff maintains that the "discrimination, harassment, and retaliation" that he suffered during his employment with BCPD caused him "to suffer severe mental and emotional distress

---

[13] Defendants counter, ECF 43-11 at 7: "Plaintiff was not transferred to Cockeysville Precinct, but was on loan to Cockeysville Precinct."

and harm, including anxiety, sleeplessness, panic attacks, irritability, and depression." ECF 43-1 ¶ 42. According to plaintiff, he took "extended medical leave" beginning in May 2013 (*id.*), which lasted at least until January 2014 (*see* ECF 43-6 at 6) and concluded no later than July 2015. *See* ECF 43-1 ¶ 42.[14]

On August 21, 2013, the EEOC issued a "Dismissal and Notice of Rights" to Williams. ECF 43-18 at 1. It provided, in relevant part, *id.*: "Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes." It also said, *id.* (bold and underlined in original): "Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice** . . . ."

This suit followed on November 15, 2013. ECF 1. In addition to allegations pertaining to Sgt. Williams, the Complaint contains a substantial section titled "The Baltimore County Police Department has a policy, pattern, or practice of disparate treatment of black officers." *Id.* at 16; *see id.* ¶¶ 159-200.[15] The Complaint provides, *inter alia*, alleged instances in which African-American BCPD officers have suffered adverse employment actions and disparate treatment relative to similarly situated "white" officers. *Id.* ¶ 163; *see id.* ¶¶ 159-200. In plaintiff's Opposition (ECF 43 at 36 n.11), he avers (*id.*): "The evidence of a pattern or practice

---

[14] Based on a psychiatric report dated February 4, 2014 (ECF 43-6), Sgt. Williams was interviewed on January 14, 2014. *Id.* at 1. At the time of his interview, Williams remained on leave. Plaintiff's Affidavit (ECF 43-1) is undated, but it was docketed on July 23, 2015. *See* Docket. In the Affidavit, plaintiff noted his return to work. ECF 43-1 ¶ 42 ("When I returned from medical leave, I was placed in a modified-duty position in the Criminal Information Processing Unit, where I remain employed by Baltimore County."). Therefore, by the date of filing of the Affidavit, he had returned to work.

[15] Plaintiff's other submissions allege that women and racial minorities are underrepresented in the BCPD. *See, e.g.,* ECF 43-9, Contextual Department Information.

of race discrimination in this case is relevant to prove Sgt. Williams' individual claim for violation of Title VII."[16]

On the date suit was filed (November 15, 2013), through counsel, Williams also filed, by hand delivery, another "Charge of Discrimination" with the EEOC ("Second Charge" or "Second Charge of Discrimination").  ECF 43-19.  The Second Charge alleges discrimination based on "race," "color," and "retaliation."  *Id.* at 2.  And, plaintiff checked the box for "continuing action."  *Id.*  The "particulars" refer to a seven-page submission titled "Randy Williams' Supplemental Information" (the "Supplemental Information"), which Sgt. Williams's attorneys signed.  *Id.* at 9; *see id.* at 3-9.  The Supplemental Information begins, *id.* at 3 (bold, capitalized, and underlined in original):  "**THIS STATEMENT HAS BEEN SUBMITTED FOR THE SOLE PURPOSE OF PROVIDING THE <u>EQUAL EMPLOYMENT OPPORTUNITY COMMISSION</u> WITH ADDITIONAL BACKGROUND INFORMATION AND SHOULD NOT BE PROVIDED TO RESPONDENT OR ANY OF ITS REPRESENTATIVES, EMPLOYEES, OR ITS LEGAL COUNSEL FOR ANY REASON**."

The Supplemental Information contains a section titled "Factual Background."  *Id.* at 3-7.  It duplicates—verbatim in many instances—the allegations in the Complaint.  *Id.* at 3-7; *see* ECF 1 at 11-20.  In particular, the Supplemental Information sets forth allegations as to discriminatory conduct by Lt. Mead between November 2012 and May 2013.  ECF 43-19 at 4-6.  The

---

[16] As the parties appear to recognize (*see* ECF 38-1 at 16-17; ECF 43 at 36 n.11), the focus is on Sgt. Williams's personal experience. *See Honor v. Booz–Allen & Hamilton, Inc.,* 383 F.3d 180, 190 (4th Cir. 2004) (declining to focus on discriminatory treatment of plaintiff's Booz–Allen colleagues when plaintiff himself suffered no such discrimination) (citing *Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 761 (4th Cir. 1998) ("[A]n individual plaintiff in a private, non-class action alleging employment discrimination is not litigating common questions of fact, but the discrete question of whether the employer discriminated against the plaintiff in a specific instance."), *vacated on other grounds,* 527 U.S. 1031 (1999)).

Supplemental Information also submits that BCPD "has a policy, pattern or practice of disparate treatment of black officers" and repeats the related factual allegations contained in the complaint. ECF 43-19 at 6; ECF 1 at 16; *see* ECF 1 at 11-20, ECF 43-19 at 4-7.

On February 4, 2014, Christiane Tellefsen, M.D., a Board Certified forensic psychiatrist, issued a report concerning Sgt. Williams's mental health issues to Mary Lader, Claims Manager for the Baltimore County Office of Human Resources ("HR").  ECF 43-6 at 1; *see id.* 1-10.  At the time, Sgt. Williams remained on medical leave, although, based on Dr. Tellefsen's report, it appears that HR had suggested to Sgt. Williams that he should return to work "on modified duty."  *Id.* at 6.  Before Dr. Tellefsen issued her report, Sgt. Williams had also "initiated a disability retirement application . . . ."  *Id.* at 9.

Dr. Tellefsen's report was based on a five-hour "comprehensive psychiatric interview" (*id.* at 2) with Sgt. Williams as well as a review of records from Sgt. Williams's general practitioner and psychologist.  *Id.* at 1, 5-6; *see id.* at 7.  According to Dr. Tellefsen, Sgt. Williams began psychological treatment during May 2013 (*id.* at 8) and received a diagnosis of "Major Depression and Anxiety."  *Id.* at 6.  Dr. Tellefsen reported that during her interview with Sgt. Williams, he "described in great detail many of the incidents" of alleged racial discrimination (*id.* at 5), which he apparently identified as the root cause of his mental health struggles.  *See id.* at 4-6.  Dr. Tellefsen offered her opinion, "to a reasonable degree of medical certainty," as follows, *id.* at 10 (bold in original):

**Randy Williams is currently unable to work as a police officer.**

**Randy Williams has not yet reached maximum medical improvement.**
He is suffering from Adjustment Disorder with Anxiety and Depression. He has a scheduled evaluation with a psychiatrist for a trial of antidepressant medication.

Such medication will likely make a difference in his current condition and could restore his ability to do his job.

**His Adjustment Disorder is the direct result of his employment with the Baltimore County Police Department,** if his account of his job situation is accurate.

On some unspecified date, Sgt. Williams's application for disability retirement was denied. ECF 43-1 ¶ 42. Also on some unspecified date, although no later than July 23, 2015, Sgt. Williams returned to a "modified-duty position in the Criminal Information Processing Unit" and remains employed by the County. *Id.*

On July 23, 2014, the EEOC issued a "Notice of Right to Sue" to Williams as to the Second Charge. ECF 43-20 at 2. It says, in relevant part, *id.*: "Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge."[17] The "Notice of Right to Sue" also informed Sgt. Williams that a lawsuit pursuant to a Title VII claim must be brought within ninety days. *Id.*

At his deposition on March 17, 2015 (ECF 38-5) plaintiff testified that he did not suffer an adverse employment action as a result of his encounters with Lt. Ensor or Lt. Mead. *Id.* at 3. In particular, he said, *id.*: "I will stipulate that I did not get demoted. I was not denied the opportunity to get promoted. I did not lose pay and anything in that adverse impact area that you are talking about . . . ." Moreover, plaintiff acknowledge that he has not suffered a "monetary" injury. *Id.* Rather, plaintiff avers, *id.*: "My mental health has been affected from working in this

---

[17] As noted, the record indicates that plaintiff filed the Second Charge of Discrimination on November 15, 2013 (ECF 43-19 at 1), more than 180 days before the EEOC issued its "Notice of Right to Sue." ECF 43-20 at 2.

environment and its patterns and practice of discrimination, hostile work environment and harassment."

## II.    Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24 (1986). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. Ltd. v. Zenith, Radio Corp.,* 475 U.S. 574, 586 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see Dulaney v. Packaging Corp. of Am.,* 673 F.3d 323, 330 (4th Cir. 2012).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts' showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied,* 514

U.S. 1042 (2004); *see also Celotex,* 477 U.S. at 322–24.   Moreover, in resolving a summary

judgment motion, a court must view all of the facts, including reasonable inferences to be drawn

from them, in the light most favorable to the non-moving party.   *See Matsushita Elec. Indus. Co.*

*Ltd.,* 475 U.S. at 587; *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor*

*and City Council of Baltimore,* 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion,* 720 F.3d

169, 173 (4th Cir. 2013).

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial."   *Anderson,* 477 U.S. at 249.   Thus, in considering a summary judgment motion, the

court may not make credibility determinations.   *Jacobs v. N.C. Administrative Office of the*

*Courts,* 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French,* 499 F.3d 345,

352 (4th Cir. 2007).   Moreover, in the face of conflicting evidence, such as competing affidavits,

summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to

resolve factual disputes, including matters of witness credibility.   *See Black & Decker Corp. v.*

*United States,* 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.,*

290 F.3d 639, 644–45 (4th Cir. 2002).

However, to defeat summary judgment, conflicting evidence must give rise to

a *genuine* dispute of material fact. *Anderson,* 477 U.S. at 247–48.   If "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact

precludes summary judgment.   *Id.* at 248; *see Libertarian Party of Va. v. Judd,* 718 F.3d 308,

313 (4th Cir. 2013).   Conversely, summary judgment is appropriate if the evidence "is so one-

sided that one party must prevail as a matter of law."   *Anderson*, 477 U.S. at 252.   And, "the

mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

### III. Discussion

### A. Title VII – Exhaustion

The County submits, in relevant part, ECF 38-1 at 8-9:

> In the [First Charge of Discrimination], Randy Williams make[s] allegations of discrimination against his supervisor, Lieutenant Janet Ensor. The Charge states that the last date of discrimination was October 15, 2010. This Court only has jurisdiction to consider those claims against Lieutenant Ensor which are contained in the Charge, which in the Complaint are paragraphs 1- 99. (Compl. p. 2-10, ¶¶ 1-99). Everything after that date and involving different claims or parties cannot be considered by this Court because they were not included in the Charge and the Plaintiff failed to exhaust administrative remedies with regards to those claims.

Williams counters, ECF 43 at 37: "[I]t cannot seriously be questioned that Sgt. Williams timely and properly exhausted his administrative remedies for all the claims in this case."  He adds, *id.* at 38-39: "All of the allegations in the complaint are directly referenced in Sgt. Williams' charges of discrimination or supplemental filings, are reasonably related to the allegations in the charges, or would naturally have arisen from a reasonable investigation of those allegations. . . . There was no need for Sgt. Williams to do anything further to exhaust administrative remedies."  In particular, plaintiff maintains that on November 15, 2013, he filed the Second Charge of Discrimination "out of an abundance of caution," which "detailed numerous incidents and a pattern of discrimination, harassment, and retaliation that had occurred since the filing of the [First Charge of Discrimination], including discrimination and harassment that was perpetrated by Lt. Mead."  *Id.* at 39.

Plaintiff avers, *id.*: "There was no need for Sgt. Williams to file a new civil complaint at that time, as the issues referenced in the second Charge of Discrimination were already included in the complaint currently pending before this Court." In effect, he contends that his suit, filed on November 15, 2013, was, at the most, premature. *Id.*

A potential plaintiff must file a charge with the EEOC before filing suit in a federal court under Title VII. 42 U.S.C. § 2000e–5(f)(1) (2006) (permitting civil suit by the "person claiming to be aggrieved" after filing of a charge with the EEOC and upon receipt of a right-to-sue letter); *see also, e.g., Miles v. Dell, Inc.,* 429 F.3d 480, 491 (4th Cir. 2005); *Puryear v. Cnty. of Roanoke,* 214 F.3d 514, 518 (4th Cir. 2000). This "exhaustion requirement ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible." *Miles,* 429 F.3d at 491.

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Institution,* 429 F.3d 505, 510 (4th Cir. 2005). Rather, together with the agency investigation and settlement process it initiates, the requirement "'reflects a congressional intent to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes.'" *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013) (quoting *Chris v. Tenet,* 221 F.3d 648, 653 (4th Cir. 2000)).[18] "Allowing [the EEOC] first crack at these cases respects Congress's intent . . . ." *Sydnor v. Fairfax Cnty.,* 681 F.3d 591, 593 (4th Cir. 2012).

---

[18] For a description of the full EEOC complaint, investigation, and settlement process, *see Balas,* 711 F.3d at 407.

Title VII's exhaustion requirement also functions as a jurisdictional bar in federal courts where plaintiffs have failed to comply with it. In *Balas,* 711 F.3d at 406, the Court said: "[F]ederal courts lack subject matter jurisdiction over Title VII claims for which a plaintiff has failed to exhaust administrative remedies."

Even when, as here, a plaintiff has filed a claim with the EEOC, a court cannot consider matters that were not properly raised during the EEOC process. *See, e.g., Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) (quoting *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 963 (4th Cir. 1996)) ("'Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'"); *Miles*, 429 F.3d at 491.

To determine whether a plaintiff has "properly alleged [a claim] before the EEOC" in a manner satisfying the exhaustion requirement, courts "may look *only* to the charge filed with that agency." *Balas,* 711 F.3d at 408 (emphasis added); *see also Evans,* 80 F.3d at 962–63 ("The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint."); *Chacko*, 429 F.3d at 506 ("This charge frames the scope of future litigation."). Although courts "recognize that EEOC charges often are not completed by lawyers and as such must be construed with utmost liberality," courts are "not at liberty to read into administrative charges allegations they do not contain." *Balas,* 711 F.3d at 408 (citations and quotation marks omitted). Rather, courts are constrained by the four corners of the charge and the inference of "'any charges that would naturally have arisen from an investigation thereof . . . .'" *Id.* at 407–08 (citations omitted).

Notably, in *Sydnor,* 681 F.3d at 594, the Fourth Circuit said: "[A]n administrative charge of discrimination does not strictly limit a Title VII suit which may follow. Instead, so long as a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, she may advance such claims in her subsequent civil suit." *Accord Jones v. Southpeak Interactive Corp. of Del.,* 777 F.3d 658, 669 (4th Cir. 2015).

Plaintiff timely filed suit after exhausting the EEOC administrative process as to allegations contained in his First Charge of Discrimination.  On the same date that Williams brought suit, he also filed a Second Charge of Discrimination.  The Second Charge expanded the scope of allegations of discrimination, to include events beyond the dates in the First Charge, as well as persons whose conduct was not mentioned in the First Charge.  However, Williams seems to argue that the allegations in the Complaint were either included in the First Charge or reasonably related to it.

 Looking, as I must, to the four corners of the First Charge, *Balas,* 711 F.3d at 407–08, it pertains only to conduct that plaintiff alleges occurred during Lt. Ensor's tenure as his commander from roughly mid-2010 until mid-2011.  Plaintiff's allegations in the Second Charge pertain to Lt. Mead as plaintiff's commander.  Lt. Mead may have assumed command by July 2011 (*see* n.10, *supra*), but certainly no later than November 2012 (ECF 43-2 at 25), and presumably continued in that role until at least May 2013.  *See* ECF 43-1 ¶ 34.  Some of the alleged unlawful conduct by Mead occurred nearly two years after Lt. Ensor ceased to be plaintiff's supervisor.  Thus, the Second Charge arises from different factual episodes and involves different actors.  It follows that plaintiff's allegations of misconduct as to Lt. Mead are

not reasonably related to the allegations in the First Charge, which largely involved Lt. Ensor.

Therefore, at the time plaintiff filed suit, he had failed to exhaust his administrative remedies as

to his claims in the Second Charge, concerning Lt. Mead's conduct.

It also seems that, in filing the Second Charge, plaintiff did not intend to pursue the

EEOC's administrative process.  Notably, the Supplemental Information to the Second Charge of

Discrimination begins, ECF 43-19 at 3 (capitalized and underlined in original): "**THIS**

**STATEMENT HAS BEEN SUBMITTED FOR THE SOLE PURPOSE OF PROVIDING**

**THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION WITH ADDITIONAL**

**BACKGROUND INFORMATION AND SHOULD NOT BE PROVIDED TO**

**RESPONDENT OR ANY OF ITS REPRESENTATIVES, EMPLOYEES, OR ITS LEGAL**

**COUNSEL FOR ANY REASON**."

As the Fourth Circuit explained in *Balas*, 711 F.3d at 406-07 (citations omitted):

> The requirement of filing a charge with the EEOC against the party sued serves
> two principal purposes: "'First, it notifies the charged party of the asserted
> violation. Secondly, it brings the charged party before the EEOC and permits
> effectuation of the [Civil Rights] Act's primary goal, the securing of voluntary
> compliance with the law.'"

If plaintiff asked the EEOC not to disclose the information to his employer, then clearly

his filing was not for the purpose of exhaustion.  And, filing suit before exhausting the EEOC's

administrative process as to matters contained in the Second Charge achieved neither of the two

objectives identified in *Balas*.  The County had no notice of the new charges and no opportunity

to comply voluntarily with Title VII before being brought into court.[19]

---

[19] To be sure, once plaintiff received the notice of right to sue as to the First Charge, he
had to bring suit within ninety days—well before any new administrative charge might have
been exhausted.  However, plaintiff could have timely filed suit as to the First Charge and then,

Plaintiff relies on *Wrighten v. Metropolitan Hospitals, Inc.*, 726 F.2d 1346 (9th Cir. 1984), to support his contention that an eventual notice of right to sue from the EEOC could cure any defect in his prematurely filed claims in the Complaint. *See* ECF 43 at 39. His reliance is misplaced.

In *Wrighten*, the Ninth Circuit considered a case in which plaintiffs timely filed charges of discrimination with the EEOC and then brought suit "[s]ome thirty days later," without waiting for a "'right to sue' letter." *Id.* at 1351. Defendants did not file a motion to dismiss. *Id.* Approximately two years later, but before the case went to trial, the EEOC issued notices of right to sue. *Id.* The Ninth Circuit agreed with the district court's conclusion that "the subsequent issuance of the 'right to sue' letters cured any jurisdictional defects." *Id.* (citing *Berg v. Richmond Unified Sch. Dist.*, 528 F.2d 1208, 1212 (9th Cir. 1975) ("True, such letters have often been characterized [as] a 'jurisdictional prerequisite' to a lawsuit under Title VII. *See, e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). However, we read this statutory requirement in the light of the well-established principle that procedural niceties should not be employed to impede a Title VII claimant from obtaining a judicial hearing on the merits."), *vacated on other grounds*, 434 U.S. 158 (1977)). The Ninth Circuit concluded, *id.*: "There is no evidence that early filing of the Title VII claim precluded the state from performing its administrative function." (Citing *Pinkard v. Pullman-Standard, a Div. of Pullman, Inc.*, 678 F.2d 1211, 1219 n.6 (5th Cir. 1982) ("[T]he filing of a Title VII action

after exhausting the EEOC's administrative process as to the Second Charge, sought to amend his complaint to incorporate new allegations that were exhausted after suit was filed. Alternatively, plaintiff could have filed a second suit and sought to consolidate the cases. Either avenue would have permitted plaintiff to preserve his opportunity to sue as to the First Charge while also complying with the requirements of the EEOC's administrative process.

simply does not require the EEOC to terminate its mediation efforts or issue a right-to-sue letter.")

As a preliminary matter, in *Wrighten*, 726 F.2d 1346, the defendants did not object to plaintiffs' failure to exhaust.  *Id.* at 1351 ("Premature suits are always subject to a motion to dismiss and there was none here.").  Here, by contrast, the County argues that Sgt. Williams exhausted his claims only as to Lt. Ensor.  *See* ECF 38-1 at 8-12.

Moreover, as I see it, the Ninth Circuit's analysis in *Wrighten*, 726 F.2d 1346, cannot be harmonized with more recent guidance from the Fourth Circuit in *Balas*, 711 F.3d 401.  In particular, the *Wrighten* Court merely concluded that the premature filing of suit did not "preclude" the EEOC's state counterpart from "performing its administrative function."  *Id.*  In contrast to *Balas*, 711 F.3d 401, the *Wrighten* Court did not acknowledge the important role that the EEOC's administrative process plays in effectuating Title VII's goals of notice and voluntary compliance.

As to claims under Title VII, I conclude that the Court lacks subject matter jurisdiction with respect to the allegations in the Complaint that pertain to the Second Charge of Discrimination.[20]

I turn to consider the Title VII claims that pertain to the First Charge of Discrimination.

### B.  Title VII–Methods of Proof

Title VII prohibits an employer from discriminating against "any individual with respect to his compensation terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e—2(a)(1). *See Freeman v. Dal-*

---

[20] As discussed, *infra*, plaintiff is not required to exhaust the EEOC's administrative process as to his § 1981 claim.

*Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014). The statute makes clear that the discrimination must be on the basis of plaintiff's "race, color, religion, sex, or national origin." *See* 42 U.S.C. §§ 2000–e2(a)(1). "The Civil Rights Act of 1991 . . . amended Title VII to provide that 'an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.' 42 U.S.C. § 2000e–2(m)." *Gentry v. East West Partners Club Mgmt. Co.*, ____ F.3d ____, 2016 WL 851673 (4th Cir. Mar. 4, 2016). And, in order to prevail under Title VII, "the existence of some adverse employment action is required." *James v. Booz–Allen & Hamilton, Inc.,* 368 F.3d 371, 375 (4th Cir. 2004).

An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC,* 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)). Single acts that may not be cognizable as adverse actions on their own may, over time, cumulatively amount to an unlawful employment practice where they create a hostile work environment. *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115 (2002); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Hoyle,* 650 F.3d at 333–34.

In general, there are "two avenues" at trial by which a plaintiff may prove intentional employment discrimination. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc) (recognized in *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) as abrogated on other grounds by *Univ. of Texas Sw. Med. Ctr. v. Nassar*, ____ U.S. ____, 133 S. Ct. 2517 (2013)). The plaintiff's first avenue is to offer "'direct or

indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See*, *e.g.*, *Young v. United Parcel Serv., Inc.*, ____ U.S. ____, 135 S. Ct. 1338, 1345 (2015) (construing the Pregnancy Discrimination Act).

The *McDonnell Douglas* scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff" to prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted). Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Under the *McDonnell Douglas* approach, if a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle*, 650 F.3d at 336; *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).   If the defendant submits no evidence of any legitimate basis for its actions, the fact finder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978).

If the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

On the other hand, "[i]f the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11.

Once the defendant meets its burden of production, the plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (emphasis in original)).

As noted, these two approaches establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*. *See Burns*, 96 F.3d at 731. At the summary judgment or motion to dismiss stage, however, these approaches merely serve to inform a court's evaluation of the allegations. *See Pettis v. Nottoway Cnty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas*. . . .").

To clarify, "[t]he prima facie case . . . is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema*, *N.A.*, 534 U.S. 506, 510 (2002). Indeed, the Fourth Circuit has admonished district courts to "'resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non.*'" *Merritt*, 601 F.3d at 295 (quoting *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991)) (alterations in *Merritt*; internal quotation marks omitted). As the Fourth Circuit has observed, "[n]otwithstanding the intricacies of proof schemes, the core of every Title VII case remains the

same, necessitating resolution of 'the ultimate question of discrimination *vel non*.'"  *Merritt,* 601

F.3d at 294-95 (citation omitted).[21]

Plaintiff has not proffered any direct evidence of intentional discrimination. Accordingly,

he must pursue his claims under the second avenue described in *McDonnell Douglas.*

## C.  Race Discrimination Under Title VII (Count I)

Reference to the elements of a prima facie case serve as a guide in analyzing a summary

judgment motion.  To establish a prima facie case for discrimination under Title VII, a plaintiff

must establish: "(1) membership in a protected class; (2) satisfactory job performance; (3)

adverse employment action; and (4) different treatment from similarly situated employees

outside the protected class." *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir.

2010), *aff'd*, ___ U.S. ___, 132 S. Ct. 1327 (2012); *accord Gerner v. Cnty. of Chesterfield, Va.*,

674 F.3d 264, 266 (4th Cir. 2012).

The County submits, in relevant part, ECF 38-1 at 13:

> Nothing described by the Plaintiff even comes close to any discriminatory
> action. At best, these are no more than personality clashes between Lt. Ensor and
> the Plaintiff. The most important failure by the Plaintiff is that he does not meet
> the third prong of a *prima facie* case of disparate treatment. Plaintiff has not
> suffered any adverse employment action. He stipulates in his deposition that he
> never suffered any adverse employment action at the hands of either Lt. Ensor or
> Lt. Mead. An adverse employment action is more than receiving two written

---

[21]  On several occasions where the employer proffered evidence in its motion for
summary judgment of a legitimate reason for its adverse action, the Fourth Circuit has assumed,
without deciding, that the plaintiff established a prima facie case. *See*, *e.g.*, *Holland v.
Washington  Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007), *cert. denied*, 552 U.S. 1102 (2008);
*Hux v. City of Newport News*, 451 F.3d 311, 314 (4th Cir. 2006); *Laber v. Harvey*, 438 F.3d 404,
432 (4th Cir. 2006) (en banc); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 319-20
(4th Cir. 2005); *cert. denied*, 546 U.S. 1091 (2006); *Rowe v. Marley Co.*, 233 F.3d 825, 829 (4th
Cir. 2000); *see also Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 736-37 (D. Md. 2009);
*Spriggs v. Pub. Serv. Comm'n*, 197 F. Supp. 2d 388, 394 (D. Md. 2002).

counseling forms. Therefore, Plaintiff has failed to make out a case *prima facie* case of disparate treatment.

Plaintiff asserts, ECF 43 at 46: "The EEOC interprets Title VII expansively with respect to what constitutes a term, condition, or privilege of employment . . . ." In particular, he submits that he was "subject to a hostile work environment," and that he faced a litany of adverse employment actions by Lt. Ensor. *Id.* at 48. In this regard, plaintiff points out that "Lt. Ensor issued him multiple written counseling forms. She also refused to allow him to select his own acting sergeants. She removed him from the position of acting lieutenant. [And, s]he criticized his performance to his superiors [and] to his subordinates . . . ." *Id.* at 49.

The Fourth Circuit has explained: "An adverse employment action is a discriminatory act that adversely affects the terms, conditions, or benefits of a plaintiff's employment." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (internal quotation marks, citation, and alterations omitted). The Court has described an "adverse employment action" as one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle*, 650 F.3d at 377 (quoting *Burlington Indus., Inc.*, 524 U.S. at 761); *see also Romeo v. APS Healthcare Bethesda, Inc.*, 876 F. Supp. 2d 577, 591 (D. Md. 2012).

Typically, an adverse employment action has been found in cases of "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999); *see also James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004). "'Although conduct short of ultimate employment decisions can constitute adverse employment action, there still must be a tangible effect on the terms and conditions of employment.'" *Thorn v. Sebelius*, 766

F. Supp. 2d 585, 598 (D. Md. 2011) (Chasanow, J.) (quoting *Geist v. Gill/Kardash P'ship*, 671 F.

Supp. 2d 729, 737 n. 6 (D. Md. 2009)), *aff'd*, 465 Fed. Appx. 274 (4th Cir. 2012).

As a preliminary matter, plaintiff agreed at his deposition that he "did not get demoted"

and was "not denied the opportunity to get promoted." ECF 38-5 at 3. According to plaintiff, he

also "did not lose pay . . . ." *Id.* Rather, plaintiff contends that Ensor's reprimands; negative

comments to his subordinates; direct appointment of his Acting Sergeants; and refusal to permit

him to work as her Acting Lieutenant constituted adverse employment actions. ECF 43 at 48.

"Reprimands, whether oral or written, do not *per se* significantly affect the terms or

conditions of employment." *Lewis v. Forest Pharmaceuticals, Inc.,* 217 F. Supp. 2d 638, 648 (D.

Md. 2002) (citations omitted). Rather, a reprimand is a "tangible employment action" when

"evidence shows that a reprimand not only bruises an employee's ego or reputation, but also

works a real, rather than speculative, employment injury." *Id.* Because plaintiff has not

proffered evidence to show that Lt. Ensor's reprimands had a tangible effect on plaintiff's

employment, he has failed to establish an adverse employment action with respect to

it. *See Newman v. Giant Food, Inc.,* 187 F. Supp. 2d 524, 529 (D. Md. 2002) (plaintiff could not

establish that the verbal warning or counseling letter he received for arriving late was an adverse

action "without evidence that the warning could lead to further disciplinary action, such as

termination"), *aff'd sub nom. Skipper v. Giant Food Inc.,* 68 Fed. Appx. 393 (4th Cir. 2003); *see*

*Nye v. Roberts,* 159 F. Supp. 2d 207, 214 (D. Md. 2001) (finding a reprimand letter did not

amount to an adverse employment action, where the letter only asked plaintiff to correct her

behavior, and "did not state that it would lead to her termination or demotion or a decrease in

pay"), *vacated on other grounds,* 47 Fed. Appx. 247 (4th Cir. 2002).

"Title VII does not remedy everything that makes an employee unhappy." *Jeffers v. Thompson,* 264 F. Supp. 2d 314, 329 (D. Md. 2003). "It is not a statute intended to police standards of general fairness in the workplace . . . ." *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 262 (4th Cir. 2008). Notably, "[a]n action that merely causes an employee irritation or inconvenience, but does not affect a term, condition, or benefit of [his] employment, is not an adverse employment action." *Spriggs v. Pub. Serv. Comm'n of Maryland,* 197 F. Supp. 2d 388, 393 (D. Md. 2002).

Plaintiff fails to identify how Lt. Ensor's alleged conduct constituted more than an irritation, inconvenience, or personality conflict. Although Sgt. Williams contends that Lt. Ensor made negative comments about his job performance, he offers no indication how these comments—precisely two alleged comments to a single subordinate—changed a term, condition, or benefit of his employment.

Likewise, although plaintiff submits that Lt. Ensor prevented him from selecting his own Acting Sergeants, the parties agree that Lt. Ensor's decisions to appoint directly each squad's Acting Sergeant applied to all squads under her command. *See* ECF 43-1 ¶ 26; ECF 43-4, Deposition of Lt. Ensor, at 54-55. Sgt. Williams alleges that he suffered an adverse employment action because Lt. Ensor directly selected an Acting Sergeant, Ofc. Dill, whom Sgt. Williams believed to be less qualified for the position than the officer whom Sgt. Williams had selected. *See* ECF 43-1 ¶ 26. Construing the facts in the light most favorable to Sgt. Williams, as I must, *see Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587, Sgt. Williams provides no explanation for why the direct appointment of a subordinate—even a subordinate whom Sgt. Williams found to be unqualified—significantly changed Sgt. Williams's employment status. *See Hoyle*, 650 F.3d

at 337.   Indeed, the record suggests that Sgt. Williams continued to command a squad, and presumably supervised his Acting Sergeants, until May 2013—more than two and a half years after Lt. Ensor appointed Ofc. Dill as Acting Sergeant.

Finally, it is undisputed that Lt. Ensor removed plaintiff from the position of Acting Lieutenant on April 11, 2011.  *See* ECF 43-1 ¶ 27; ECF 43-4 at 68-69.  According to plaintiff's submissions, he returned to the position of Acting Lieutenant by July 5, 2011 (ECF 43-1 ¶ 29)—no more than three months after Lt. Ensor had removed him from the position.

As noted, an Acting Lieutenant appears to perform the duties of a lieutenant when the lieutenant is not on duty.  *See* ECF 43-4 at 68-69.  From the record, it is not apparent how frequently a sergeant serves as an Acting Lieutenant; whether all sergeants serve as Acting Lieutenants; or the precise duties an Acting Lieutenant performs, aside from supervising subordinate officers in a lieutenant's absence.  Nor is there any indication that an Acting Lieutenant receives greater financial compensation, more benefits, or is more likely to be promoted to that position.  And, as noted, Williams expressly conceded at his deposition:  "I did not get demoted.  I was not denied the opportunity to get promoted.  I did not lose pay . . . ."  ECF 38-5 at 3.  Rather, he claimed that his "mental health has been affected from working in this environment and its pattern and practice of discrimination, hostile work environment and harassment."  *Id.*

Construing the facts in the light most favorable to Sgt. Williams, the record does not support that Sgt. Williams's removal from the position of Acting Lieutenant—a removal that lasted no more than three months—created a significant change in Sgt. Williams's employment

status. *See Hoyle*, 650 F.3d at 337. Accordingly, plaintiff has failed to establish an adverse employment action under Title VII.

### D. Race Discrimination under 42 U.S.C. § 1981 (Count III)

In relevant part, 42 U.S.C. § 1981(a) provides: "All persons within the Jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Section 1981(b) states: "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

Like Title VII, 42 U.S.C. § 1981 prohibits, *inter alia*, "discrimination in employment on the basis of race." *Yashenko v. Harrah's NC Casino Co., LLC,* 446 F.3d 541, 551–52 (4th Cir. 2006); *see Johnson v. Ry. Express Agency, Inc.,* 421 U.S. 454, 459–60 (1975) ("§ 1981 affords a federal remedy against discrimination in private employment on the basis of race"). Section 1981(b) was enacted as part of the Civil Rights Act of 1991 in order to overrule legislatively the Supreme Court's holding in *Patterson v. McLean Credit Union,* 491 U.S. 164 (1989), to the effect that § 1981 applied "only to the formation of a contract" and not "to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions." *Id.* at 176–77. *See generally CBOCS West, Inc. v. Humphries,* 553 U.S. 442, 449–51 (2008) (discussing post-*Patterson* enactment of § 1981(b)).

The framework for proof of claims of employment discrimination under § 1981 is the same as the framework applicable to a Title VII claim. *See Love–Lane v. Martin,* 355 F.3d at 786 (stating, in case involving employment discrimination claim under Title VII, § 1981, and §

1983, that "the elements required to establish such a case are the same under all three statutes")

(citing *St. Mary's Honor Ctr.,* 509 U.S. at 506 n. 1). In particular, discrimination may be proven

by one of two methods: (1) "'direct or indirect'" evidence of discrimination, under "'ordinary

principles of proof,'" *Burns,* 96 F.3d at 731 (citation omitted); or (2) the burden-shifting

approach articulated by the Supreme Court in *McDonnell Douglas,* 411 U.S. 792. *See,

e.g., Lightner,* 545 F.3d at 263 n.* (4th Cir. 2008) ("[T]he *McDonnell Douglas* framework

applies to discrimination claims under . . . § 1981."); *Love–Lane,* 355 F.3d at 786 (stating that

"the *McDonnell Douglas* framework, developed for Title VII, has been used to evaluate race

discrimination claims under the three statutes," *i.e.,* Title VII, § 1981, and § 1983); *Gairola v.

Com. of Va. Dept. of Gen'l Servs.,* 753 F.2d 1281, 1285–86 (4th Cir. 1985).

"Procedurally, however, Section 1981 claims are not subject to the same exhaustion and

timeliness requirements as those asserted pursuant to Title VII." *Sewell v. Strayer Univ.*, 956 F.

Supp. 2d 658, 673 (D. Md. 2013) (citing *White v. BFI Waste Servs., LLC,* 375 F.3d 288, 291-92

(4th Cir. 2004)); *cf. Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 460 (1975) ("it has been

noted that the filing of a Title VII charge and resort to Title VII's administrative machinery are

not prerequisites for the institution of a § 1981 action.").  Accordingly, unlike plaintiff's claims

under Title VII, plaintiff's claim for employment discrimination under § 1981 is not limited to

factual allegations that plaintiff exhausted through the EEOC's administrative process.

"The timeliness of Section 1981 claims is instead governed either by state law (as to

allegations of misconduct during the formation of an employment contract) or by the four-year

statute of limitations established by 28 U.S.C. § 1658 (as to allegations of misconduct after the

formation of the employment relationship)." *Sewell*, 956 F. Supp. 2d at 673.  Because plaintiff's

§ 1981 claim does not concern discrimination in the formation of his employment contract, but rather alleged post-formation discrimination, the applicable statute of limitations is four years, pursuant to 28 U.S.C. § 1658. *See James v. Circuit City Stores, Inc.*, 370 F.3d 417, 420–21 (4th Cir. 2004) (applying four-year statute of limitations under § 1658 to claims of post-contract-formation employment discrimination under § 1981).   Plaintiff filed suit in November 2013. ECF 1.  Accordingly, his § 1981 claim is not time-barred.

Plaintiff did not suffer an adverse employment action during Lt. Ensor's tenure as his commanding officer.   Thus, the question is whether Sgt. Williams suffered an adverse employment action after Lt. Ensor ceased to be his superior.

After Williams worked with Ensor, he served as an Acting Lieutenant under Lt. Mead. *See* ECF 43-1 ¶ 29; ECF 43-2 at 26.  As to Mead, the crux of Sgt. Williams's allegations is that, under Lt. Mead's leadership, misconduct by "white" officers was treated differently than misconduct by "black" officers.  ECF 1 at 11.  But, the case does not involve a claim that Sgt. Williams engaged in misconduct.   Sgt. Williams alleges that he had a tempestuous meeting with Lt. Mead on May 8, 2013, at which Lt. Mead used profanity; accused plaintiff of conspiring with Lt. Lilly; and threatened to "crush" him.   ECF 43-1 ¶ 34; *see id.* ¶¶ 34-35.   Sgt. Williams maintains that, two days later, on May 10, 2013, he received an administrative transfer to the Cockeysville Precinct, and that his transfer constituted an adverse employment action.  *See* ECF 43-1 ¶¶ 39-40.

Sgt. Williams alleges in his Complaint, ECF 1 ¶ 152: "Under Departmental Policy and Department practice and procedure, a sergeant ordinarily can be involuntarily transferred from one precinct to another only for disciplinary reasons."  And, in his Affidavit, he alleges, ECF 43-

1 ¶ 40: "In my experience, a sergeant in the [BCPD] would be involuntarily transferred from one precinct to another only for disciplinary reasons."  *See also* ECF 43 at 49 ("Two days after Lt. Mead made this threat, Sgt. Williams was administratively transferred, *a move that he considered to be disciplinary*.") (Emphasis added).  Yet, plaintiff provides no evidence of such a policy or that an administrative transfer, such as the one that he received, necessarily is a form of discipline.

Certainly, not every transfer within BCPD is an adverse employment action.  Sgt. Williams, for example, alleges that he was transferred at least three times before arriving at the Woodlawn Precinct in June 2010.  ECF 43-1 ¶¶ 4-5.  In addition, plaintiff stipulated at his deposition that, despite his allegations of discrimination, he did not suffer a demotion; was not denied an opportunity for a promotion; and did not incur "monetary" loss.  ECF 38-5 at 3. Moreover, following the conclusion of an "extended medical leave" (ECF 43-1 ¶ 42), which lasted from May 2013 until at least January 2014 (*see* ECF 43-6 at 6),[22] Sgt. Williams returned to a "modified-duty position in the Criminal Information Processing Unit" and remains employed by the County.  ECF 43-1 ¶ 42.

Accordingly, plaintiff has failed to show an employment action that could be considered adverse.  Thus, he cannot establish a claim of race discrimination under 42 U.S.C. § 1981.

---

[22] *See* Note 14, *supra*.

### E.  Racially Hostile Work Environment under Title VII (Count II)[23]

The County submits that the "specific charge filed by the Plaintiff with [the] EEOC never mentioned hostile work environment . . . ."  ECF 38-1 at 14.  Nonetheless, it argues, *id.*: "The particulars of the Plaintiff's EEOC charge do not describe a workplace permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

Plaintiff counters, ECF 43 at 41:

>        The County does not challenge the facts that the conduct at issue was unwelcome, was based on Sgt. Williams' race, and is imputable to it as the employer.  It argues only that the conduct at issue was not sufficiently severe or pervasive to alter the terms and conditions of Sgt. Williams' employment.

In particular, plaintiff submits, *id.*: "The County does not appear to challenge the fact that Sgt. Williams subjectively perceived the conduct at issue to be abusive.  There is no genuine factual dispute as to the issue."  Rather, according to plaintiff, the County argues solely that the conduct by Sgt. Williams's supervisors was not "objectively abusive—that a reasonable person in Sgt. Williams's position would not have found the environment to be objectively hostile [and] abusive."  *Id.* at 41.  Plaintiff contends that whether Sgt. Williams's work environment was objectively hostile is a question of fact that should be reserved for a jury.  *Id.*

---

[23]  Count III of the Complaint (ECF 1 ¶¶ 217-231), which alleges employment discrimination on the basis of race, under § 1981, states, in relevant part, *id.* ¶ 229: "The harassment of Plaintiff was sufficiently pervasive and severe as to alter the terms and conditions of Plaintiff's employment, and created a hostile, intimidating, and/or abusive work environment."  As clarified by plaintiff's Opposition (ECF 43 at 40-50), plaintiff alleges a hostile work environment exclusively under Title VII.  *See id.* at 50 ("From all of this evidence, a jury could reasonable [sic] infer that Sgt. Williams' was subjected to an objectively hostile work environment in violation of Title VII.")

As discussed, plaintiff exhausted the EEOC administrative process as to Lt. Ensor's alleged conduct.  Plaintiff's First Charge of Discrimination states, in relevant part, ECF 43-16 at 2: "I believe I have been discriminated and retaliated against because of my race (black) in violation of Title VII of the Civil Rights Act of 1964, as amended with respect to discipline, participating in protected activity, *harassment* and terms and conditions of employment." (Emphasis added).

Courts "recognize that EEOC charges often are not completed by lawyers and as such must be construed with utmost liberality . . . ."  *Balas,* 711 F.3d at 408.  In my view, the allegation of harassment in Williams's First Charge is reasonably related to a claim for a hostile work environment.  *See Sydnor,* 681 F.3d at 594.  Accordingly, I am satisfied that plaintiff properly exhausted his claim for a racially hostile work environment, in violation of Title VII, as to the alleged conduct by Lt. Ensor.  However, he has not exhausted such a claim as it relates to any other employee of the BCPD, or as to events beyond the period included in his First Charge.

Single acts that may not be cognizable as adverse employment actions on their own may, over time, cumulatively amount to an unlawful employment practice where they create a hostile work environment.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Hoyle*, 650 F.3d at 333-34.  To establish a Title VII claim that a workplace is racially hostile, a plaintiff must establish "'that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *Boyer-Liberto v. Fontainbleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (quoting *Okoli v. City of Balt.,* 648 F.3d 216,

220 (4th Cir. 2011)); *see also Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc) (stating elements in the context of a hostile work environment based on sex), *cert. denied*, 540 U.S. 1177 (2004).

"A hostile environment exists '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Boyer-Liberto*, 786 F.3d at 281 (quoting *Harris*, 510 U.S. at 21 (alterations in *Boyer-Liberto*)). With regard to the third element, the Fourth Circuit has said, *Boyer-Liberto*, 786 F.3d at 277-78:

> Element three of a hostile work environment claim requires a showing that "the environment would reasonably be perceived, and is perceived, as hostile or abusive"; the plaintiff may, but is not required to, establish that the environment is "psychologically injurious." *See Harris* 510 U.S. at 22, 114 S.Ct. 367. Whether the environment is objectively hostile or abusive is "judged from the perspective of a reasonable person in the plaintiff's position." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). That determination is made "by looking at all the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. It "is not, and by its nature cannot be, a mathematically precise test." *Id.* at 22, 114 S.Ct. 367.

> To be sure, viable hostile work environment claims often involve repeated conduct. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115–17, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). That is because, "in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* at 115, 122 S.Ct. 2061. For example, "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (alteration in original) (quoting *Meritor,* 477 U.S. at 67, 106 S.Ct. 2399). The same goes for "simple teasing [and] offhand comments." *See Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Importantly, however, an "isolated incident[ ]" of harassment can "amount to discriminatory changes in the terms and conditions of employment," if that incident is "extremely serious." *Id.* (internal quotation marks omitted).

> In measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., "a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals." *Rodgers v. W.–S. Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir. 1993). Simply put, "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 763, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

As plaintiff notes, it is undisputed that plaintiff "subjectively perceived" that Lt. Ensor's conduct created a hostile work environment.   ECF 43 at 41.   In particular, Dr. Tellefsen's psychiatric evaluation of Sgt. Williams concluded, *inter alia*, ECF 43-6 at 10 (bold in original):

"**His Adjustment Disorder is the direct result of his employment with the Baltimore County Police Department**, if his account of his job situation is accurate."

But, the question is whether "the environment is *objectively* hostile or abusive . . . ." *Boyer-Liberto*, 786 F.3d at 277 (emphasis added).   "Whether the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'"   *Id.* (quoting *Oncale*, 523 U.S. at 81).   As noted, "[t]hat determination is made 'by looking at all the circumstances,' which 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 23).

"The County sees the *Harris* case as illustrative of the type of behavior necessary to create a hostile work environment."   ECF 38-1 at 14.   In *Harris*, 510 U.S. 17, the Supreme Court considered a factual record that showed that the plaintiff's employer "insulted her because of her gender and often made her the target of unwanted sexual innuendos."   *Id.* at 19.   In particular, the plaintiff's employer, *inter alia*, "told her she was 'a dumb ass woman'", "suggested that the two

of them 'go to the Holiday Inn to negotiate [Harris'] raise,'" and "made sexual innuendos about Harris' and other women's clothing." *Id.* The County avers, ECF 38-1 at 14: "Compare the environment in *Harris* to the environment the Plaintiff alleges he had to endure and the Court will conclude that the Plaintiff's work environment was nowhere near the severity and pervasiveness necessary to make out a *prima facie* case of hostile work environment."

Plaintiff concedes that "the facts of this case differ from those that were before the Court in *Harris*," but contends that "the County's reliance exclusively on *Harris* . . . is misplaced." ECF 43 at 42. Plaintiff maintains, *id.* at 41: "Whether particular incidents of harassment were 'sufficiently severe or pervasive is quintessentially a question of fact.'" (quoting *Paroline v. Unisys Corp.*, 879 F.2d 110, 105 (4th Cir. 1989)). Plaintiff submits that a reasonable jury might find that Sgt. Williams was subjected to a racially hostile work environment and therefore summary judgment is inappropriate. *See* ECF 43 at 41-42.

To be sure, in *Harris*, 510 U.S. 17, the Supreme Court cautioned that "especially egregious examples of harassment" "do not mark the boundary of what is actionable." *Id.* at 22 (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986)). Yet, claims for a hostile work environment frequently arise from factual allegations of unambiguously derogatory or harassing comments and conduct. *See, e.g., Boyer-Liberto*, 786 F.3d (reversing the grant of summary judgment for defendants where an employee alleged that she was twice called a "'porch monkey' and threatened with the loss of her job by a Caucasian restaurant manager."); *Okoli*, 648 F.3d at 220 ("Viewing the facts in the light most favorable to Okoli, she suffered upwards of twelve (12) incidents in just four months . . . . Functionally, these incidents span fondling, kissing, propositioning, describing sexual activities, and asking intimate questions."); *Anderson v.*

*G.D.C., Inc.*, 281 F.3d 452, 459 (4th Cir. 2002) ("Anderson was subjected, on a daily basis, to verbal assaults of the most vulgar and humiliating sort. Such evidence suffices to create a jury question regarding whether the harassing conduct was sufficiently severe or pervasive to alter the terms and conditions of employment.").

This was also the factual basis for two of the cases on which plaintiff relies. *See Paroline*, 879 F.2d at 103 ("Shortly after Paroline started work in November 1986, Moore directed his attention toward her. He made sexually suggestive remarks to Paroline that she considered offensive. Sometime in December of 1986, Moore approached Paroline as she was working and started rubbing his hands on her back, and continued even though she indicated that he should stop."); *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 311 (4th Cir. 2008) ("According to Ingram, the abusive environment was marked by a steady stream of demeaning comments and degrading actions directed against him by his coworkers—conduct that went unaddressed and unpunished by Sunbelt supervisors. . . .  For instance, coworkers used religiously-charged epithets and often called Ingram names such as 'Taliban' and 'towel head.' In addition, fellow employees frequently made fun of Ingram's appearance, challenged his allegiance to the United States, suggested he was a terrorist, and made comments associating all Muslims with senseless violence. Sometimes Ingram's supervisors personally participated in the harassment.")

Here, the record contains no allegations of an offensive or derogatory utterance.  Rather, the issue is whether, construing the record in the light most favorable to Sgt. Williams, a reasonable person in plaintiff's position could conclude that, during Lt. Ensor's tenure, the conduct in question was "sufficiently severe or pervasive to alter the plaintiff's conditions of

employment and to create an abusive work environment," which is one "permeated with discriminatory intimidation, ridicule, and insult." *Boyer-Liberto*, 786 F.3d at 277.  In my view, a reasonable person could not conclude that Ensor created a work environment that was "permeated with discriminatory intimidation, ridicule, and insult." *Id.*

The recent decision in *Howerton v. Bd. of Educ. of Prince George's Cty.*, TDC-14-0242, 2015 WL 4994536 (D. Md. Aug. 19, 2015), provides guidance.  In *Howerton*, the Court granted summary judgment to defendant in a claim for a hostile work environment in violation of Title VI,[24] which applies the same standard as Title VII.  *Id.* at *14 (citing *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003)).  The plaintiff in *Howerton*, a "white male in his early forties" (*Howerton*, 2015 WL 4994536 at *1), alleged that he had been subjected to a racially hostile work environment by his African American supervisors.  *See id.* at *1-2.  In particular, plaintiff maintained that one of his supervisors expressed a desire to hire "a particular African American employee" (*id.* at *15) and another supervisor told plaintiff that he could not supervise certain personnel because, in a past supervisory capacity, plaintiff had "'only hired white people.'"  *Id.* at *2.  The plaintiff also alleged that he had received "prank phone calls" concerning a fictitious police investigation and was falsely accused by a supervisor of sexual harassment.  *Id.*  In addition, the plaintiff maintained that he had received repeated reprimands, a suspension, and a negative performance review.  *Id.* at *4-5.  Notably, there is no indication in *Howerton* that the

---

[24] Title VI of the Civil Rights Act of 1964 provides, 42 U.S.C. § 2000d: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

plaintiff was ever subjected to racially pejorative comments or physically threatening behavior.[25]

*See id.* at *15.  Judge Chuang concluded, *id.* *16:

> [The acts contained in the record] were not "physically threatening or humiliating" acts akin to the verbal and physical harassment that typically characterizes a hostile work environment, and there is no evidence that these personnel actions were so debilitating to Howerton as to "unreasonably interfere[ ] with [his] work performance." *Boyer–Liberto,* 786 F.3d at 277 (quoting *Harris,* 510 U.S. at 23) (internal quotation marks omitted). Thus, a reasonable jury could not conclude that the alleged unwelcome acts, individually or collectively, qualitatively or quantitatively, created an environment where "the workplace is permeated with discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Id.* at 277; *Orenge* [*v. Veneman*], 218 F. Supp. 2d [758, 769-69 (D. Md. 2002)].

Here, as in *Howerton*, there are no factual allegations of derogatory comments or physically threatening conduct.  But, as was the case in *Howerton,* 2015 WL 4994536, Williams maintains that his supervisor made racially charged comments to him, including during conversations about his supervisory responsibilities.  *See* ECF 43-1 ¶ 9; *id.* ¶¶ 7-9.   Likewise, both the plaintiff in *Howerton,* 2015 WL 4994536, and Sgt. Williams cite to numerous examples in which their supervisors issued written and oral reprimands that misrepresented their job performance and levied false accusations of misconduct.[26]  *See, e.g.,* ECF 43-1 ¶¶ 15-16, 25; ECF 43-1 ¶ 18.  The crux of Sgt. Williams's contention is that the frequency with which Lt. Ensor reprimanded him for supposed misconduct during her roughly year-long tenure as his commander created a hostile work environment.  *See* ECF 43 at 42-44.

---

[25] In *Howerton,* 2015 WL 4994536, the plaintiff maintained that he had received a letter of reprimand following "an undisputed [physical] confrontation between Howerton and another employee where there is no evidence that the incident was instigated for racial reasons."  *Id.* at *15.

[26] As noted, the County contests many of Sgt. Williams's allegations.  *See, e.g.,* ECF 43-4 at 68-69.  However, in the context of a summary judgment motion, I must accept the truth of plaintiff's version of events.

To be sure, the record suggests—and indeed the County stipulates (*see* ECF 43-11 at 7)—that plaintiff had an acrimonious relationship with Lt. Ensor.  But, construing the record in the light most favorable to plaintiff, a reasonable jury could not find that Lt. Ensor's conduct was "sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment," which is one "permeated with discriminatory intimidation, ridicule, and insult." *Boyer-Liberto*, 786 F.3d at 277 (citation and quotation marks omitted).

Accordingly, the County is entitled to summary judgment as to plaintiff's hostile work environment claim.

## F.  Retaliation under Title VII (Count IV)

The County submits, ECF 38-1 at 16: "As with all the previous allegations, Plaintiff has failed to prove that the County took any adverse employment action against him."   It also maintains, *id.*: "Retaliation cannot be inferred from evidence that does no more than suggest it's a possibility."

Citing *EEOC Compliance Manual, The U.S. Equal Employment Opportunity Commission* (Feb. 17, 2016, 2:59 P.M.), http://www.eeoc.gov/policy/docs/retal.html#IIpartD, plaintiff counters, ECF 43 at 47-48:

> Any action that a reasonable employee would consider to be materially adverse and which might dissuade a reasonable employee from making a charge of discrimination may constitute an adverse employment action. Actions such as "threats, reprimands, negative evaluations, harassment, or other adverse treatment" may be considered adverse employment actions. *EEOC Compliance Manual* § 8-II.D.1.[] Even actions that do not constitute "ultimate employment actions" like termination or demotion may nevertheless dissuade complaints of discrimination and therefore constitute unlawful retaliation." *EEOC Compliance Manual* § 8-II.D.3.[]

According to plaintiff, *id.* at 48: "Sgt. Williams suffered numerous adverse employment actions."

In order to establish a prima facie claim of retaliation under Title VII, "a plaintiff must show that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action." *Okoli,* 648 F.3d at 223 (citations omitted); *see Price v. Thompson,* 380 F.3d 209, 212 (4th Cir. 2004). As with a substantive discrimination claim, the *McDonnell Douglas* framework applies at trial: "If a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [the adverse action], the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle,* 650 F.3d at 337 (quoting *Yashenko v. Harrah's NC Casino Co., LLC,* 446 F.3d 541, 551 (4th Cir.2006)).

A plaintiff must first establish that he engaged in protected activity, such as filing a complaint with the EEOC. *Okoli*, 648 F.3d at 223–24. As the Fourth Circuit has explained, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *EEOC v. Navy Federal Credit Union,* 424 F.3d 397, 406 (4th Cir. 2005). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metropolitan Washington Airports Authority,* 149 F.3d 253, 259 (4th Cir. 1998). "To fall under the protection of the opposition clause . . . behavior need not rise to the level of formal charges of discrimination. The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.,* 647 F.2d 441, 448 (4th Cir. 1981) (citation omitted).

The second element of the prima facie case pertains to an "adverse employment action." In a retaliation claim, the standard for an adverse employment action is more lenient than for a substantive discrimination claim. *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 64 (2006) ("*Burlington Northern*") ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). In the retaliation context, a plaintiff must show that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citations omitted). Moreover, Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern,* 548 U.S. at 67.

Notably, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist,* 671 F. Supp. 2d at 738 (quoting *Burlington Northern,* 548 U.S. at 68). Even under the "lower bar" applicable to Title VII retaliation claims, "none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, 'an 'Attendance Warning,' 'a verbal reprimand, 'a formal letter of reprimand,' or 'a proposed termination.'" *Wonasue v. University of Maryland Alumni Ass'n,* 984 F. Supp. 2d 480, 492 (D. Md. 2013) (quoting *Rock v. McHugh,* 819 F.Supp.2d 456, 470–71 (D. Md. 2011)).

Plaintiff maintains (ECF 1 ¶¶ 233-34)—and the County does not dispute—that plaintiff's First Charge of Discrimination constituted a protected activity for purposes of Title VII.  The

question is whether, based on the factual record, construed in the light most favorable to Sgt. Williams, *see Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587, plaintiff has shown an "adverse employment action."

As indicated, the standard for an adverse employment action is more lenient for a retaliation claim than it is for a substantive discrimination claim. *Burlington Northern*, 548 U.S. at 64. Nevertheless, the record does not indicate that Sgt. Williams suffered an adverse employment action after he filed his charge of discrimination in June 2011.

Williams complains that his superiors acted on his complaints of misconduct by "black" BCPD officers, but ignored his complaints about misconduct by "white" officers. ECF 1 at 11. This pattern of allegedly disparate enforcement of departmental policy purportedly culminated in a meeting with Lt. Mead on May 8, 2013 (ECF 43-1 ¶ 34) at which, according to plaintiff, Lt. Mead used profanity; accused plaintiff of conspiring with Lt. Lilly; and threatened to "crush" him. *Id.* ¶¶ 34-35. Yet, there is no indication that Lt. Mead alluded to or even knew that Sgt. Williams had filed his First Charge of Discrimination nearly two years earlier. Even assuming, as I must, that Sgt. Williams's supervisors ignored his reports of misconduct by "white" officers and that Lt. Mead made the remarks on May 8, 2013, Sgt. Williams alleges no concrete injury following his submission of his First Charge of Discrimination. *See Burlington Northern,* 548 U.S. at 67.

Sgt. Williams filed his First Charge in June 2011. Notably, after a period of not more than three months—no later than July 5, 2011—Sgt. Williams resumed his role as Acting Lieutenant.

To be sure, Sgt. Williams maintains that his administrative transfer to the Cockeysville Precinct on May 10, 2013, constituted an adverse employment action. *See* ECF 43-1 ¶ 38. As noted, the Complaint states, ECF 1 ¶ 152: "Under Departmental Policy and Department practice and procedure, a sergeant ordinarily can be involuntarily transferred from one precinct to another only for disciplinary reasons." Yet, plaintiff provides no evidence of such a policy or that an administrative transfer, such as the one that he received, is necessarily a form of discipline. *See* ECF 43-1 ¶ 40; ECF 43 at 49. Indeed, as discussed, not every transfer within BCPD is an adverse employment action, as exemplified by Sgt. Williams's allegation that he was transferred at least three times before arriving at the Woodlawn Precinct in June 2010. ECF 43-1 ¶¶ 4-5. In addition, as discussed, plaintiff stipulated at his deposition that he was not demoted; was not denied a promotion; and did not suffer "monetary" loss. ECF 38-5 at 3. Moreover, following the conclusion of an "extended medical leave" (ECF 43-1 ¶ 42), which lasted from May 2013 until at least January 2014 (*see* ECF 43-6 at 6), Sgt. Williams returned to a "modified-duty position in the Criminal Information Processing Unit" and remains employed by Baltimore County. ECF 43-1 ¶ 42.

In addition, I agree with the County that plaintiff has failed to allege that his administrative transfer was causally connected to his having filed his First Charge of Discrimination. *See* ECF 38-1 at 16 ("Retaliation cannot be inferred from evidence that does no more than suggest it's a possibility."). Here, almost two years elapsed between the filing of the First Charge in June 2011, which alleged discriminatory conduct by one supervisor (ECF 43-16 at 1), and the administrative transfer to the Cockeysville Precinct in May 2013, allegedly at the hands of another supervisor. ECF 43-1 ¶ 39.

With respect to the causation element, ordinarily, there must exist "some degree of temporal proximity to suggest a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 501 (4th Cir. 2005). Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted). "[A] lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld,* 328 F.3d 145, 151 n.5 (4th Cir. 2003)); *see Price v. Thompson,* 380 F.3d 209, 213 (4th Cir. 2004) (although period of nine to ten months between protected conduct and adverse action presented "a very close question," trier of fact could find causal connection where defendant declined to hire plaintiff "at the first available opportunity").

Moreover, "[t]o establish a causal connection between a protected activity and an adverse action, a plaintiff must prove that the protected activity preceded the adverse action and that the employer knew the employee engaged in a protected activity." *Gibson v. Marjack Co.*, 718 F. Supp. 2d 649, 655 (D. Md. 2010) (citing *Causey v. Balog,* 162 F.3d 795, 803–04 (4th Cir. 1998); *Dowe v. Total Action against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir. 1998)); *cf. Demott v. CSX Transp., Inc.*, JFM-14-277, ___ WL ___ at *1 (D. Md. Mar. 3, 2016); *Conrad v. CSX Transp., Inc.*, WMN-13-3730, 2014 WL 7184747, at *4 (D. Md. Dec. 15, 2014) (on appeal).

As noted, there is no indication in the record that Lt. Mead mentioned plaintiff's First Charge during their meeting on May 8, 2013, or that Lt. Mead was even aware that plaintiff had

filed an EEOC complaint.  *See* ECF 43-10 at 2.  Indeed, plaintiff's First Charge did not mention Lt. Mead, and there is no factual basis to believe that Lt. Mead would necessarily have been aware of a two-year-old EEOC charge that named another supervisor.  Moreover, plaintiff alleges that he was "later told by another officer that the reason [he] was transferred is that [he] 'disrespected' Lt. Mead."  ECF 43-1 ¶ 40.  Thus, even assuming that Lt. Mead orchestrated Sgt. Williams's administrative transfer to the Cockeysville Precinct, and even assuming that the transfer constituted an adverse employment action, plaintiff's own submissions suggest that Lt. Mead's reason for doing so was unrelated to plaintiff's First Charge.

Accordingly, the County is entitled to summary judgment as to the retaliation claim.

### III.    Conclusion

I conclude that, as to the claims under Title VII, plaintiff failed to exhaust his administrative remedies as to any allegations of discriminatory conduct that occurred after Lt. Ensor ceased to be his supervisor.  In addition, the evidence shows that plaintiff did not suffer an adverse employment action.  Therefore, plaintiff cannot establish a claim of employment discrimination under Title VII or 42 U.S.C. § 1981, or for retaliation in violation of Title VII.  In addition, the evidence does not establish a claim for a racially hostile work environment under Title VII.

A separate Order follows, consistent with this Memorandum Opinion.


Date: March 11, 2016                                    _____/s/_____
                                                       Ellen Lipton Hollander
                                                       United States District Judge